# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-07-00099-CV

In the Interest of E. N. C.

FROM THE DISTRICT COURT OF BELL COUNTY, 169TH JUDICIAL DISTRICT
NO. 210,653-C, HONORABLE GORDON G. ADAMS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal stems from Tammie Carr's decision to allow Lisa and Kerry Daun to adopt her child, E.N.C., and from Carr's subsequent decision to stop the adoption process. Carr placed E.N.C. in the Dauns' care, but she never signed an affidavit of relinquishment. Several months later, Carr asked that the Dauns return E.N.C. In response, the Dauns filed a suit affecting the parent-child relationship. *See* Tex. Fam. Code Ann. § 102.001-.002 (West 2008). After a trial, the district court appointed the Dauns as managing conservators of E.N.C. and appointed Carr as the sole possessory conservator. Although Carr was named as possessory conservator, she was not awarded any periods of access or possession other than the opportunity to have two visits with E.N.C. on days specified by the court. On appeal, Carr contends that the Dauns did not have standing to file the suit. Further, she asserts that the district court erred by naming the Dauns as managing conservators and by failing to award her any periods of access or possession. Finally, Carr argues that several of the district court's findings of fact and conclusions of law are not supported

by the evidence presented during trial or by the relevant governing law. We will affirm the district court's judgment in part and reverse and remand in part.

## BACKGROUND

Carr is a single mother raising her daughter C.C. Prior to and during the trial in this case, Carr resided in a home located on her parents' property. For several years, Carr was involved in an on-again, off-again romantic relationship with Donald Garner. Garner is not the father of C.C.

Late in 2003, Carr ended her relationship with Garner. Around that same time, she discovered that she was pregnant with E.N.C. Carr decided not to tell Garner about the pregnancy, and after discussing the pregnancy with various members of her family, Carr decided to place E.N.C. for adoption. Shortly thereafter, Carr contacted Living Legacy, an adoption agency, and initiated adoption procedures. When discussing the adoption with Living Legacy employees, Carr instructed them that she did not want Garner to find out that she was pregnant. After reviewing several potential applicants from Living Legacy's files, Carr eventually chose Kerry and Lisa Daun as the potential adoptive parents for E.N.C.[1]

Before E.N.C. was born, Living Legacy contacted Garner and informed him that Carr was pregnant, that he was the father of her child, and that Carr desired to place her child in an adoptive home. After receiving the information, Garner, in July 2004, filed a lawsuit in Montgomery County, Texas, seeking to be declared E.N.C.'s father and seeking to enjoin Carr from

---

[1] During the adoption process, Carr communicated her desire to have an open adoption under which she would be allowed to have regular visits with E.N.C. and would be provided with regular updates regarding E.N.C.'s well being.

completing the adoption. The Montgomery County district court issued a temporary restraining order prohibiting Carr from finalizing an adoption agreement, but that order expired shortly after E.N.C.'s birth. After the restraining order was issued, Carr and the Dauns sought to terminate Garner's parental rights. No resolution was reached in the Montgomery County suit.

At the end of July 2004, E.N.C. was born. A few days later, the Dauns took E.N.C. home. However, due to the suit filed by Garner, Living Legacy never asked Carr to sign an affidavit of relinquishment. In other words, although E.N.C. was living with the Dauns, Carr had not formally relinquished her parental rights. While E.N.C. was living with the Dauns, Carr regularly communicated with the Dauns concerning E.N.C.'s well-being and had a couple of supervised visits with E.N.C. Carr agreed to the living arrangement for months.

In May 2005, Carr informed Living Legacy and the Dauns that she would like to raise E.N.C. and asked the Dauns to return E.N.C. to her. In response, the Dauns filed a suit affecting the parent-child relationship. *See* Tex. Fam. Code Ann. §§ 102.001-.002. Shortly thereafter, the district court held a preliminary hearing. Garner, Carr, and the Dauns attended the hearing, and Garner admitted that he was the father of E.N.C. During the hearing, Garner and Carr asked for additional time to hire an attorney. After the hearing, the district court issued temporary orders specifying that Garner was the father of E.N.C., appointing the Dauns temporary managing conservators of E.N.C., and prohibiting Carr and Garner from having access to E.N.C. unless all parties agreed otherwise.

A trial began early in 2006. Carr and the Dauns were present for the trial, but Garner never made an appearance. After the trial concluded, the district court rendered its judgment. Specifically, the district court appointed the Dauns as managing conservators for E.N.C. *See*

3

Tex. Fam. Code Ann. § 153.371 (West 2008) (specifying rights and duties of nonparents appointed as managing conservators). The court also appointed Carr as the sole possessory conservator of E.N.C. *See id.* §§ 153.191 (explaining that there is presumption in favor of appointing parent, who was not appointed as managing conservator, as possessory conservator), 153.192 (West 2008) (explaining rights and duties of possessory conservator). Although the court stated that Carr's powers and duties, if any, would be determined at a later date, it did require Carr to pay child support and allowed Carr to have two supervised visits with E.N.C. on days specified by the court.[2] Further, the court enjoined Carr from allowing Garner to be present during those visits and required Carr to submit to a psychological evaluation before any future visits would be granted. *Cf.* Tex. Fam. Code Ann. § 153.010 (West 2008) (allowing courts to order party to participate in counseling with mental health professional). Moreover, the court stated that after the evaluation had been completed, the parties could request a hearing to determine whether Carr should have further visitation rights and whether she will have any additional powers and duties. In addition, the court specifically determined that Garner had no rights as a parent of E.N.C. and was not appointed as a possessory conservator. Finally, the court ordered Carr and Garner to pay child support for E.N.C.

After Carr submitted to the psychological evaluation and after the evaluation was filed with the district court, the court issued its order. The order incorporated most of the statements made by the court when it rendered its judgment. Although the order did impose additional obligations on Carr that were not specifically stated during the court's rendition, such as requiring Carr to inform

---

[2] Carr did not attend either of the scheduled visits, but in her appellate briefs, Carr contends that she was unable to attend either visit because the Dauns had moved and had not provided her with their new address or telephone number.

4

the Dauns regarding E.N.C.'s health, education, and welfare, and to inform the Dauns if Carr moves or intends to marry a known sex offender, the order did not grant Carr any additional visits or specify any right of access to or possession of E.N.C. by Carr. In other words, the order did not set out a possession schedule or incorporate the standard possession order. Finally, the order repeated the court's prior instruction that the parties "may set this matter for a hearing to determine if [Carr], as a parent sole possessory conservator, shall have powers and duties, if any, and further visitation with [E.N.C.], if any."

After the district court issued its order, Carr appealed the judgment of the district court. Shortly after hearing oral argument in this case, this Court abated the appeal and sent the case back to the district court to allow it to issue findings of fact and conclusions of law supporting its judgment. After the district court issued its findings and conclusions, the case was reinstated, and both parties filed additional briefs in the matter.

## DISCUSSION

On appeal, Carr raises seven issues. First, she argues that the district court lacked subject matter jurisdiction over this case because the Dauns did not have standing to file the suit. In her second through sixth issues, Carr contends that the district court erred by (1) appointing the Dauns as managing conservators of E.N.C.; (2) finding that she had committed domestic violence; (3) entering a final order that failed to address her parental rights; (4) failing to award her a standard possession order or establish an alternative possession schedule; and (5) entering a final order that reserved the issues of visitation and rights for future litigation and that required Carr to submit to a psychological evaluation before applying for additional parental and visitation rights. In her

5

seventh issue, Carr asserts that most of the findings of fact and conclusions of law issued by the district court are not supported by the evidence presented at trial or by the relevant family code provisions.

**The Dauns Had Standing**

In her first issue on appeal, Carr argues that the Dauns did not have standing to file this suit. Standing is a component of subject-matter jurisdiction, *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993), and concerns who may file a claim, *Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex. 1998). The issue of jurisdiction is a question of law, which is reviewed de novo. *Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 841 (Tex. 2007).

The family code specifies those individuals who have standing to file a suit affecting a parent-child relationship. Tex. Fam. Code Ann. § 102.003 (West 2008). Subsection 102.003(a)(9) provides, in relevant part, that this type of suit may be filed by "a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition." *Id.* § 102.003(a)(9). Further, the family code instructs that when computing whether enough time has passed to confer standing, courts "shall consider the child's principal residence during the relevant time preceding the date of commencement of the suit." *Id.* § 102.003(b).

Although she acknowledges that the Dauns had possession of E.N.C. for more than six months prior to their filing suit, Carr contends that they maintained custody without her consent and that without her consent, the Dauns' possession did not confer standing. Further, she asserts that

6

she demonstrated her lack of consent by informing the Dauns that she wanted E.N.C. returned to her within six months of E.N.C.'s birth.[3] Alternatively, Carr asserts that even if she had consented to the Dauns' possession of E.N.C., Garner had not given his consent, and for this reason, the Dauns did not have standing.

We disagree with Carr's contentions for the following reasons. First, nothing in the language of subsection 102.003(a)(9) expressly requires that either parent consent to a nonparent's possession of a child before the nonparent may file a suit affecting a parent-child relationship. See Tex. Fam. Code Ann. § 102.003(a)(9); *see also USA Waste Servs. of Houston, Inc. v. Strayhorn*, 150 S.W.3d 491, 494 (Tex. App.—Austin 2004, pet. denied) (stating that when construing statutes, courts presume that every word was deliberately chosen and that excluded words were left out on purpose); *In re S.H.A.*, 728 S.W.2d 73, 83 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (explaining that, even in family law context and even when they might prefer otherwise, courts may not insert additional words into statutory provision unless it is necessary to give effect to clear legislative intent). By failing to insert this requirement, which we must presume was done purposefully, the legislature no doubt intended to empower individuals who have invested significant time raising and caring for the children of others and who have developed significant relationships with those children to be able to file suits to protect the best interests of the children, regardless of the wishes of the children's parents. *T.W.E. v. K.M.E.*, 828 S.W.2d 806, 808 (Tex. App.—San Antonio 1992, no writ) (explaining that purpose of former version of subsection 102.003(a)(9) was to "create standing for

[3] Although we need not decide the matter here, we do note that evidence was presented demonstrating that from the time of E.N.C.'s birth until May 2005, Carr regularly communicated her belief that allowing the Dauns to raise E.N.C. was the right thing to do. Moreover, evidence was also presented indicating that Carr did not inform the Dauns that she wanted to raise E.N.C. until May 2005, which was more than six months after E.N.C. began living with the Dauns.

7

those who have developed and maintained a relationship with a child over time"). In other words, the focus of this provision seems to be on ensuring that a sufficient relationship exists between the child and the individual seeking to file a suit affecting the child's parental relationships. *Cf. id.* (stating that legislature believed that six months was minimum time needed to develop relationship significant enough to bestow standing on nonparent). Moreover, the legislature also likely chose to not require consent in this context in order to not foreclose suits filed by individuals who have been caring for children under circumstances in which obtaining the consent of one or both parents is not feasible or warranted, such as when one or both parents have died, become ill, or for whatever reason are not part of their child's life.

Second, this determination is supported by the fact that the legislature specifically included a consent requirement in other family code provisions but chose not to include that requirement for purposes of determining standing. For example, the family code establishes a presumption in favor of appointing a parent as managing conservator, Tex. Fam. Code Ann. § 153.131 (West 2008), but also states that the presumption is rebutted when the parent "has *voluntarily relinquished* actual care, control, and possession of the child to a nonparent . . . for a period of one year or more," *id.* § 153.373 (West 2008) (emphasis added). If the legislature intended courts to consider parental consent when making determinations regarding standing under subsection 102.003(a)(9), it could have easily included language similar to that found in the provision describing one of the ways in which the parental presumption may be rebutted; instead, the legislature chose to only require that the courts determine whether the person filing suit "had actual care, control, and possession of the child for at least six months." *See* Tex. Fam. Code Ann. § 102.003(a)(9).

8

The fact that the legislature chose to list consent as an element for consideration for determining whether the parental presumption applies but not in the standing context is consistent with the fundamentally different nature of the two determinations. A determination regarding presumptions merely shifts the burdens between parties in a suit and does not deprive either side of the opportunity to present evidence regarding what they believe would be in the child's best interests. A determination regarding standing, on the other hand, could completely foreclose the ability of an individual to maintain a suit affecting a parent-child relationship and to present evidence illustrating why the best interests of the child could most effectively be served by modifying the child's current parental relationships. Moreover, standing in this context is merely a preliminary determination that must be made before the merits of the claims can properly be reached. As such, a determination that a party has had custody over a child for a sufficient period of time to confer standing to file suit does not necessarily bear upon the ultimate determination of whether that party's possession of the child was proper or whether he should continue to have possession of the child.

Finally, this conclusion is supported by a recent appellate case. In *In re S.S.G.*, the court noted that it could find no authority for the proposition that parental consent is required to confer standing under section 102.003(a)(9). 208 S.W.3d 1, 4 (Tex. App.—Amarillo 2006, pet. denied). Moreover, the court explained that the only circumstance in which an individual is denied standing despite having fulfilled the requirements of section 102.003(a)(9) occurs when that person retains possession of a child in violation of a court order. *Id.* at 3. Nothing in the record indicates that any court issued an order stating that the Dauns continued possession of E.N.C. was improper or requiring the Dauns to return E.N.C. to either Carr or Garner. Although Carr does point out that prior to E.N.C.'s birth Garner obtained a restraining order temporarily preventing Carr from

9

completing the adoption, nothing in that restraining order addressed the Dauns' possession of E.N.C. Moreover, although the record is not entirely clear regarding the expiration date of the order, what little information there is indicates that the order expired in August 2004. Accordingly, even if we were to assume that the temporary restraining order had some bearing upon the propriety of the Dauns' possession of E.N.C., we would still conclude that the Dauns had standing because they filed the suit more than eight months after the expiration of the order, meaning that the suit was filed after the Dauns had maintained possession of E.N.C. for more than the six-month statutory minimum.

As support for her assertion that consent of the parents is required under subsection 102.003(a)(9), Carr relies on *T.W.E.*, but that reliance is misplaced. At the time *T.W.E.* was decided, the relevant family code provision did not contain the qualifier stating that a person has standing if he has had possession of the child for "at least six months *ending not more than 90 days preceding the date of* the filing of the petition," Tex. Fam. Code Ann. § 102.003(9) (emphasis added), and instead stated that a person had standing if he "has had actual possession and control of the child for at least six months *immediately preceding* the filing of the petition," Act of May 26, 1989, 71st Leg., R.S., ch. 375, § 2, 1989 Tex. Gen. Laws 1477, 1477 (emphasis added); *see T.W.E.*, 828 S.W.2d at 807. The issue in *T.W.E.* was whether a man, who for years had lived with and helped raise a child that he was not the father of, had standing to file a suit affecting the child's parental relationship even though he did not have possession of the child during the three weeks preceding the filing of the suit because the child's mother had taken the child from his home. *See T.W.E.*, 828 S.W.2d at 807-08. Ultimately, the court concluded that although the statute said "immediately" preceding the filing of the suit, the three-week lapse in possession did not deprive the man of standing. *Id.* at 808.

10

While performing its analysis, the *T.W.E.* court distinguished the circumstances in that case from those found in *Perez v. Williamson*, 726 S.W.2d 634 (Tex. App.—Houston [14th Dist.] 1987, no writ), in which the *Perez* court concluded that a couple did not have standing to maintain a suit affecting a parent-child relationship. Perez had originally agreed to allow the Williamsons to adopt her baby but changed her mind shortly after the birth. *Id.* at 635. Perez obtained a writ of habeas corpus ordering the Williamsons to return her child, but the Williamsons refused to return the child and left the State with the baby without telling Perez. *Id.* Moreover, after the Williamsons moved the child to Mississippi, a court in Mississippi awarded Perez custody of the child. *Id.* When the Williamsons moved back to Texas, they attempted to adopt the child, but Perez argued that they did not have standing to file the suit. *Id.* at 635-36. The appellate court agreed and concluded that even though the Williamsons had possession of the child for years, they did not have standing because the child had been removed from their custody by the State by the time they filed suit. *Id.* at 636. Moreover, the court also stated that the Williamsons did not have standing because they only had possession of the child due to their "defiance of court orders." *Id.*

When determining that the man seeking to file a suit concerning T.W.E. had standing despite the fact that he did not have possession of T.W.E. at the time he filed suit, the *T.W.E.* court surmised that the true basis for the holding in *Perez* was that the Williamsons had retained possession of the child in violation of various court orders rather than the fact that the Williamsons did not have custody of the child at the time they filed suit. *T.W.E.*, 828 S.W.2d at 808. In its analysis, the *T.W.E.* court made the following comment, which serves as the basis for Carr's assertion that consent is required to confer standing: "for purposes of standing . . . the six-month period of possession must be consensual and not in violation of a court order." *Id.*

11

The use of the word "consensual" by the *T.W.E.* court must be viewed in light of the fact that the task the *T.W.E.* court was confronted with was determining whether the term "immediately" in a prior family code provision prohibits an individual from filing suit if the child is not in the individual's possession at the moment the suit is filed, regardless of the amount of time that the individual had custody and control over the child. It must also be examined in light of the fact that there is no indication that the mother in *T.W.E.* disputed that she had agreed to allow the man to help raise her child. For these reasons, we conclude that the inclusion of the word "consensual" in the *T.W.E.* case was dicta and was included only to demonstrate that the individual filing suit in *T.W.E.*, unlike the individuals in *Perez*, had not retained custody of a child in violation of a court order. *See In re S.S.G.*, 208 S.W.3d at 4; *see also Continental Cas. Ins. Co. v. Functional Restoration Assoc.*, 19 S.W.3d 393, 400 n.6 (Tex. 1999) (explaining that statements in opinions addressing issues not presented are dicta and, therefore, not binding).

In her supplemental briefing, Carr also cites to *In re Salgado*, 53 S.W.3d 752 (Tex. App.—El Paso 2001, orig. proceeding) as support for her proposition that the Dauns do not have standing. In that case, Jose Salgado filed a writ of mandamus challenging the issuance of a protective order that prohibited him from removing his child from the custody of his sister, Mary Nunez. *Id.* at 756. Nunez argued that the writ was moot because the protective order would have expired by the time an opinion on the matter was released. *Id.* at 757. The appellate court disagreed and stated that the writ was not moot because the "collateral consequences" exception to the mootness doctrine applied. *Id.* Essentially, the court reasoned that the issuance of the protective order had the collateral consequence of allowing the aunt to have possession of the child for a period

12

of time sufficient to confer standing to file a suit affecting the parent-child relationship. *Id.* Further, the court determined that if it declared the protective order void, a question would exist regarding "whether Nunez has standing to maintain her motion to modify in suit affecting the parent-child relationship." *Id.* at 758. After making this statement, in a footnote, the court stated that "a party who retains possession of a child against the wishes of the parent/managing conservator may not utilize the time during which the child is withheld for purposes of determining a statutory period of relinquishment." *Id.* at 758 n.4. In light of that final statement, Carr contends that the Dauns did not have standing because they only retained possession of E.N.C. for a time sufficient to confer standing by withholding E.N.C. from Carr and Garner.

Carr's reliance on *Salgado* is misplaced. In the footnote she relies on, the court explicitly stated that it was not making any determination regarding standing because that issue was not before it. *Id.* Accordingly, the statement is dicta. *See Continental Cas. Ins. Co.*, 19 S.W.3d at 400 n.6.

Moreover, the case that the *Salgado* court cited to as support for the statement Carr relies on did not address the issue of standing. *See In re De La Pena*, 999 S.W.2d 521 (Tex. App.—El Paso 1999, no pet.). *In re De La Pena* addressed section 153.373 of the family code, which provides that the parental presumption in favor of appointing a parent as managing conservator is rebutted when a parent "voluntarily relinquishes" custody of his or her child to another for more than a year. *Id.* at 527; *see* Tex. Fam. Code Ann. §§ 153.131 (establishing parental presumption), .373 (describing circumstances in which presumption is rebutted). Ultimately, the court determined that the presumption applied because although the nonparent had retained possession of the child for more than one year, the father had made several attempts to regain

13

possession of his child and, therefore, had not voluntarily relinquished custody for more than a year. *In re De La Pena*, 999 S.W.2d at 527.

However, as discussed previously, the rebuttal of a presumption is fundamentally different from a determination regarding standing, and the standing provision, unlike the parental-presumption-rebuttal provision, does not specifically include consent as an element for consideration. *Compare* Tex. Fam. Code Ann. § 153.373, *with id.* § 102.003(a)(9).

In this case, the Dauns had continuous possession of E.N.C. for more than six months before they filed suit, and there is no indication that their continued possession was in violation of a court order. Accordingly, they had standing to file this suit. *See id.* § 102.003(a)(9).

## Managing Conservators

In her second issue on appeal, Carr contends that the district court erred by failing to appoint her as managing conservator of E.N.C. and by appointing the Dauns as managing conservators for E.N.C.[4]

---

[4] On appeal, Carr also contends that the district court erred by appointing the Dauns as "Sole Managing Conservators" because the family code does not allow for the appointment of two individuals as sole managing conservators. *See* Tex. Fam. Code Ann. § 153.132 (West 2008) (explaining rights and duties of parent appointed as sole managing conservator); *id.* § 153.371 (West 2008) (explaining rights and duties of nonparent appointed as sole managing conservator). On the contrary, Carr contends that when two people are designated as managing conservators, they are appointed as "joint managing conservators." *Id.* §§ 153.133-.134 (West 2008) (explaining that parents may agree to be joint managing conservators or that court may appoint both parents as managing conservators); *see id.* § 153.372 (West 2008) (allowing nonparents to be appointed joint managing conservators). Further, Carr contends that in those circumstances, the powers and responsibilities of each conservator must be listed. *Id.* §§ 153.133-.134. Because the district court did not specify the powers and responsibilities for Lisa and Kerry Daun individually, Carr insists that the designation is improper.

We disagree. The joint-managing-conservatorship provisions directly address situations in which two individuals will be splitting custody over a child and will be parenting the child separately. For that reason, the family code requires that the powers and responsibilities for each

As mentioned previously, section 153.131 of the family code establishes a presumption in favor of the appointment of a parent as a managing conservator. Tex. Fam. Code Ann. § 153.131; *see also id.* § 153.002 (West 2008) (explaining that "best interest of the child shall always be the primary consideration . . . in determining the issues of conservatorship"). Specifically, it provides that "a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child" unless the court finds that the "appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development" or there is a history of family violence as described in section 153.004 of the family code. *Id.* § 153.131; *see also id.* § 153.005 (West 2008) (explaining that "conservator must be a parent, a competent adult, an authorized agency, or a licensed child-placing agency"). Although there is a presumption in favor of appointing a parent as managing conservator, that presumption can be rebutted. *In re J.A.J.*, 243 S.W.3d 611, 614 (Tex. 2007). Nonparents seeking custody of a child have the burden of presenting evidence of specific acts or omissions demonstrating that the appointment of the child's parent as managing conservator would result in physical or emotional harm to the child. *See*

---

joint conservator be specified. *See id.* §§ 153.133-.134; *see also id.* § 153.372 (explaining that family code requirements for appointment of parents as joint managing conservators also applies to appointment of nonparents as joint conservators). That is not the situation here. The Dauns have been and plan to continue raising E.N.C. together. Although no provision of the family code directly addresses what to designate individuals in circumstances such as these, nothing prohibits a trial court from designating two individuals as sole managing conservators. For these reasons, we cannot conclude that the district court erred by designating the Dauns as sole managing conservators or by failing to specify what their individual, rather than joint, duties and responsibilities were.

*Brook v. Brook*, 881 S.W.2d 297, 299 (Tex. 1994); *Lewelling v. Lewelling*, 796 S.W.2d 164, 168 (Tex. 1990).

In its order, the district court found that the parental presumption found in section 153.131 did not apply to this case because there was "a history of family violence involving the parents of the child." Alternatively, the court found that even if the presumption applied, it had "been rebutted" because the appointment of Carr as managing conservator would "significantly impair [E.N.C.'s] physical health or emotional development." Carr disputes both determinations.

As a preliminary matter, we note that the district court's order listed two alternative, permissible grounds to support its determination regarding managing conservatorship. Ultimately, we conclude that the evidence supports the district court's determination that appointing Carr as managing conservator would "significantly impair [E.N.C.'s] physical health or emotional development." Therefore, we need not specifically address the district court's alternative determination that there was a history of violence between Carr and Garner that precludes the appointment of Carr as managing conservator or its subsequent determination that Carr had been the initiator of domestic violence.[5] For these reasons, we also need not address Carr's third issue in which she asserts that the district court erred by concluding that she committed domestic violence.

We now address the propriety of the district court's determination that the appointment of Carr as managing conservator would "significantly impair [E.N.C.'s] physical health or emotional development." Unlike for terminations, the family code does not enumerate specific

---

[5] Even though we need not reach the issue, we do note that, as more thoroughly addressed in the next section, most of the evidence presented during the trial indicated that Carr had been a victim rather than an initiator of domestic violence.

behaviors to be considered when making conservatorship determinations and instead employs a more general standard. *In re J.A.J.*, 243 S.W.3d at 616. A determination by a district court that it would not be in a child's best interest to appoint the child's parent as a managing conservator or that the appointment would "significantly impair the child's physical health or emotional development" is subject to a preponderance-of-the-evidence standard. Tex. Fam. Code Ann. § 105.005 (West 2008); *see Lewelling*, 796 S.W.2d at 167. These determinations are reviewed on appeal for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d at 616.[6]

A district court abuses its discretion if its decision is unreasonable or arbitrary or if it acts without reference to any guiding principles or rules. *City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 757 (Tex. 2003). When determining whether a district court has abused its discretion, appellate courts must "indulge every legal presumption in favor of the judgment" and view the evidence presented to the district court "in the light most favorable to" its actions. *Powell v. Swanson*, 893 S.W.2d 161, 163 (Tex. App.—Houston [1st Dist.] 1995, no writ). Provided that there is some evidence "of a substantive and probative character" supporting the decision reached by the district court, then the district court did not abuse its discretion. *Powell*, 893 S.W.2d at 163; *see Doyle v. Doyle*, 955 S.W.2d 478, 479 (Tex. App.—Austin 1997, no pet.) (explaining that under abuse of discretion standard, factual and legal sufficiency are not independent grounds of error, "but are relevant factors in assessing whether the trial court abused its discretion"); *see also City of*

---

[6] We employ the typical abuse-of-discretion analysis in this case. The author of this opinion has previously expressed his belief that the current manner in which conservatorship determinations are reviewed does not comport with the constitutional nature of the rights involved. *See In re L.M.M.*, No. 03-04-00452-CV, 2005 Tex. App. LEXIS 7191 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op.) (Puryear, J., concurring); *In re J.R.D.*, 169 S.W.3d 740 (Tex. App.—Austin 2005, pet. denied) (Puryear, J., concurring).

*Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (stating that evidence is legally sufficient when it would "enable reasonable and fair-minded people to reach the verdict under review"); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (explaining that evidence is factually insufficient "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust").

During the trial, evidence was presented showing that Carr had a history of being involved with abusive men. Although evidence was presented showing that Carr had broken off her relationship with Garner after being abused, evidence was also presented demonstrating that she repeatedly reconciled with him. *See Lewelling*, 796 S.W.2d at 167 (explaining that placing child in unstable environment is type of conduct that "would significantly impair the physical or emotional development of the child"). Moreover, evidence was also introduced showing that Carr remained in abusive relationships despite the fact that C.C. witnessed the abuse and that Carr had reconciled with more than one individual after breaking off the relationship because she knew of or suspected that C.C. had been abused by those individuals.

Regarding relationships Carr entered into prior to her involvement with Garner, Carr's mother, Ann Carr, testified that Carr dated and married men who were abusive towards her and who were capable of hurting children. In fact, Ann testified that of the four men that Carr had married, three of them were physically abusive. Carr's brother, David Carr, also testified that Carr entered into volatile and unstable relationships and repeated Ann's testimony that three of the four individuals Carr had married were abusive towards her. In her testimony, Carr confirmed that one of her previous husbands had been physically abusive.

18

Concerning Carr's relationship with Garner, Lisa Daun testified that Carr communicated that her relationship with Garner was violent and that Garner had tried to drown her, had choked her, and had hit her hard enough to cause hearing loss. Similarly, Ann testified that Carr had previously told her that Garner was abusive and detailed the significant injuries describe above. Moreover, Ann testified that as a result of Garner's abuse, the police had been called to Carr's home on ten occasions. David also testified that he had observed abusive behavior between Carr and Garner. In her testimony, Carr confirmed that Garner had been physically abusive on four or more occasions and that the police had been called to stop the violence on more than one occasion.

Testimony was also introduced generally describing how Carr had a continuing pattern of breaking up with and then reconciling with Garner. Kerry Daun testified that during his conversations with Carr, she informed him that she has had an "off again/on again relationship" with Garner, that she had broken up with him approximately 13 times over a five-year period, and that she "will always take him back." Similarly, Carr's aunt, Wanda Vaden, testified by deposition that although Carr was supposed to have cut off ties with Garner on several occasions, he "always came back into the picture." In her testimony, Carr confirmed that she had broken up with and then reconciled with Garner on more than one occasion. Further, she said that she continued to take him back because she believed he could change, but she also stated that she no longer believed that was the case.

In addition, specific testimony was introduced describing how Carr reconciled with Garner after learning that Garner had been given deferred adjudication for sexually abusing his former stepdaughter, who was a minor at the time the abuse occurred. Ann testified that Carr hired

19

a private investigator to look into Garner's past after Garner's sisters informed Carr that he had pleaded guilty to sexually abusing his former stepdaughter. In her testimony, Carr confirmed that Garner had been given deferred adjudication for sexually abusing his former stepdaughter and stated that she ended her relationship with Garner after learning of the abuse. Moreover, she testified that at the time she learned of the sexual abuse, she was pregnant with Garner's child but that she terminated the pregnancy because she was so upset by the revelation. However, both Carr and Ann testified that Carr renewed her relationship with Garner sometime after learning about the abuse.

Further, testimony was introduced demonstrating that Carr reconciled with Garner after he had repeatedly threatened her with physical harm if she did not stop the adoption process. David testified that Carr was afraid of Garner and had asked her brother David to secretly escort her out of the hospital after she gave birth to E.N.C. because Garner had been making threats. Moreover, Lisa Daun testified that Carr had stated that she was scared of Garner because he had threatened her on so many occasions and because he told her that he would kill her if she did not get E.N.C. back. Similarly, Carr's sister-in-law, Renay Carr, testified that Carr confided in her that Garner had threatened to kill Carr if she gave E.N.C. up for adoption. Cheryl Vanderwel, an employee for Living Legacy, testified that Carr informed her that soon after E.N.C. was born, Garner threatened to kill Carr unless she stopped the adoption process and got E.N.C. back from the Dauns. In her testimony, Carr admitted that she told Living Legacy employees and the Dauns that she was terrified of Garner and that she was right to have a legitimate fear of Garner, but she denied that Garner had ever threatened to kill her.

Ann testified that despite Garner's threats, Carr reunited with Garner several months after she had participated in the proceeding to terminate his parental rights to E.N.C. and around the

20

time that Carr asked to have E.N.C. returned to her. Renay also testified that Carr and Garner reconciled after E.N.C. was born. Shortly before Carr asked that E.N.C. be returned, she informed Vanderwel that Garner had proposed to her and that she still loved him. Moreover, Vanderwel stated that when Carr inquired about having E.N.C. returned to her, she did not state that she was asking for E.N.C. because she wanted to raise E.N.C. but instead informed Vanderwel that Garner had given her a deadline for getting E.N.C. back. Vaden testified by deposition that Carr had stated that she would not be attempting to get E.N.C. back if Garner had not been in the picture.

In her testimony, Carr confirmed that she became romantically involved with Garner again a few months before the trial in this case started. She also admitted that she told Vanderwel that she still had feelings for Garner. However, although she stated that she did not remember whether she had told anyone that Garner was pressuring her to get E.N.C. back, she affirmatively stated that she asked for E.N.C. back because she wanted to and not because she had been pressured to.[7]

Although Carr denied that she was still in a romantic relationship with Garner and also stated that she had no plans to allow Garner back into her life,[8] some evidence was introduced at trial demonstrating that Garner and Carr were still involved at the time of trial in this case. For example, while giving her testimony, Carr acknowledged that she and Garner drove together for the first hearing in this case. Moreover, Kerry Daun testified that during the preliminary hearing in this

---

[7] Carr's friend, Kelly Noack, provided similar testimony and testified that Carr had expressed a desire to raise E.N.C. prior to Garner stating his preferences; however, Noack did admit that Garner may have strengthened Carr's resolve.

[8] Noack reinforced this testimony by stating that she did not believe that Carr and Garner were romantically involved anymore or that Carr would allow Garner to be a part of her life anymore.

case, Garner and Carr held hands and that he believed they were still together even though Garner discontinued his direct involvement in the case. Ann testified that Carr admitted that she and Garner still occasionally see and talk to one another. In her testimony, Carr stated that Garner was paying her attorney's fees and admitted that she had been in contact with him during the trial. Similarly, Carr's friend, Kelly Noack, testified that right before Carr left her home to attend the trial in this case, she saw Garner come to Carr's house and give Carr money for the trip, including money to pay for a hotel. Noack also testified that during a break in the proceedings, she observed Carr participate in a phone conversation with Garner in which she updated him on what had happened during the trial.

At trial, evidence was presented showing that the cause of the break up between Carr and Garner that precipitated Carr's decision to place E.N.C. for adoption was that Garner had physically assaulted C.C. Regarding the abuse, Carr testified that, on one night, Garner shoved C.C. and then grabbed C.C. and pulled her across a coffee table. Lisa Daun and Ann both confirmed Carr's testimony by testifying that Carr had described the same incident to them. In her deposition, Vaden stated that C.C. came to her home after being abused by Garner. Furthermore, as part of an investigation into the alleged act of abuse, Carr wrote a note in which she stated that Garner had bruised C.C.'s head when he "pushed her over the table" and that Garner needs to be stopped before he really hurts someone. As described earlier, testimony was also introduced showing that Carr reconciled with Garner after this incident.

Testimony was also introduced indicating that Carr had reconciled with another man despite believing that the man had abused C.C. Specifically, Ann testified that Carr left one of her

22

previous husbands because Carr believed he was sexually abusing C.C.  Ann also testified that Carr later reconciled with that individual.[9]

In addition, testimony was introduced demonstrating that as a result of Carr's involvement with Garner and others, C.C. had witnessed multiple acts of violence committed against her mother.  David testified that he had observed abusive behavior between Carr and Garner and that the abuse had occurred in front of C.C.  Additionally, he stated that when C.C. observed these events, she would curl up in a corner and cry.  Carr confirmed that C.C. had witnessed one of the abusive incidents and that C.C. had called 911 on at least two occasions, including one instance in which Garner had attempted to drown Carr.  In her testimony, Carr also stated that C.C. had witnessed acts of physical abuse committed by one of Carr's former husbands.

Furthermore, evidence was also presented demonstrating that Carr failed to recognize the need to shield C.C. from the potential for abuse and that E.N.C. could be in danger if she lived with Carr.  Although Carr denied ever feeling this way, Kerry Daun testified that during his conversations with Carr, she communicated that she was afraid Garner might sexually abuse C.C.  In the contact notes detailing interactions between Carr and Living Legacy employees, one of the entries states that Carr had communicated her fear that Garner would sexually abuse C.C. or E.N.C.  Further, after admitting that she had left C.C. alone with Garner even after learning that Garner had been given deferred adjudication for abusing his former stepdaughter, Carr justified her decision by stating that C.C. was old enough to tell her if anything inappropriate happened.  Similarly, she

---

[9] In the contact notes prepared by Living Legacy case workers, which detailed their communications with Carr, one employee wrote that Renay had communicated her belief that C.C. had been sexually abused by one of Carr's former boyfriends.

23

testified that she was not afraid to leave C.C. with Garner because she knew C.C. and because "if anything—anything in the world—would have ever come close to happening, [C.C.] would come to me. [C.C.] and I are very close, and we communicate a lot."

Finally, testimony was introduced showing that it was not in E.N.C.'s best interests to appoint Carr as managing conservator and that it was in E.N.C.'s best interests to appoint the Dauns as managing conservators. Ann testified that E.N.C. would be in danger if she lived with Carr and that Carr would be unable to protect either of her daughters from Garner if Carr reconciled with Garner.[10] Similarly, Ann testified that she was not sure if Carr would follow a court order prohibiting her from allowing Garner to have contact with E.N.C.[11] In fact, because Carr had told Ann that Garner had run off with a child from a previous marriage, Ann stated that she was afraid that Garner would take E.N.C. from Carr's custody and run away with E.N.C. Vanderwel reported that during her conversations with Carr regarding placing E.N.C. for adoption, Carr had made similar statements regarding her fear that Garner would take E.N.C. from her.

In addition, Renay testified that even if Garner were out of the picture, Carr would pose a danger to E.N.C. because she is so unstable. David testified that Carr was not responsible enough to raise E.N.C.

Moreover, Lisa Daun testified that E.N.C. has resided at her and her husband's home almost from the day that E.N.C. was born and that E.N.C. has not known any other parents. Further,

---

[10] In the contact notes, one of Living Legacy's employees wrote that C.C. stated she did not want E.N.C. "to be raised the way she had been" and that it was good that E.N.C. was going to be adopted.

[11] In her testimony, Carr stated that she was unsure whether Garner would abide by a court order prohibiting him from having contact with E.N.C. and that she cannot control him.

Lisa testified that during the time E.N.C. has lived at her home, E.N.C. has been well cared for and has developed normally. In addition, Lisa stated that she and her husband have formed strong connections with E.N.C. and that they have begun making plans regarding E.N.C.'s education and future. Further, Lisa testified that she believed removing E.N.C. from their care would be detrimental to E.N.C.'s well being. Similarly, Kerry Daun also gave testimony describing the strong bond that he and his wife have developed with E.N.C. Both Ann and David testified that it was in E.N.C.'s best interests for the Dauns to continue raising her, and Renay testified that the Dauns provided E.N.C. with a "loving, peaceful, stable, [and] solid foundation."

Furthermore, a social worker who performed a home study of the Dauns' residence testified that the Dauns had made a loving and stable home for E.N.C. In addition, the home study stated that the Dauns had been married for nine years; that they both have jobs and have been consistently employed; that their home is clean, family friendly, stable, warm, and loving; that the Dauns have installed child-proof locks throughout their house; that they love E.N.C. very much; that they desire to give E.N.C. a safe and secure home; that they have made arrangements for E.N.C.'s care during the day while they work; and that all of them have bonded as a family. Ultimately, the report recommended that the Dauns be allowed to raise E.N.C.

In light of the preceding, we cannot conclude that the district court abused its discretion by concluding that the parental presumption had been rebutted, that the appointment of Carr as managing conservator would significantly impair E.N.C.'s physical health or emotional development, and that the Dauns should be appointed as managing conservators for E.N.C.

**Possessory Conservator**

In her fourth through sixth issues, Carr contends that the district court erred by failing to award her any rights of possession of or access to E.N.C. and by failing to award her the standard possession order.

As mentioned previously, the district court named Carr as possessory conservator, required her to submit to a psychological evaluation, required Carr to pay child support, and allowed her to have two visits with E.N.C., but the district court did not set out any other access rights or set out a possession schedule. However, the court did state that once Carr had completed the evaluation, the parties may request a hearing to determine any future visits by Carr and to establish her rights and duties as possessory conservator.

After Carr appealed the district court's order, this Court abated the appeal and sent it back to the district court with instructions that the district court issue findings of fact and conclusions of law. In two separate conclusions, the district court determined that Carr was not entitled to have any access to E.N.C. and that Carr was not entitled to any access because she "has a history or pattern of committing family violence during the two years preceding the date of the filing of this suit or during the pendency of this suit." Essentially, by issuing those two conclusions, the district court made its final determination in the matter and concluded that Carr should be given no additional powers or duties or access to E.N.C.[12]

---

[12] In her fourth issue, Carr contends that the district court erred by entering a final order that did not establish her rights, powers, and privileges as a possessory conservatory. In her sixth issue, Carr argues that the district court erred by entering a final order that reserved the possession schedule and the issue of her rights as a possessory conservator for future litigation. However, by issuing the conclusions of law previously discussed, the district court determined that Carr was not entitled to any other rights as possessory conservator and was not entitled to possession. For that reason, the district court has established the rights it believed Carr was entitled to and has not reserved any issue for future litigation. Accordingly, in resolving these issues, we are now only confronted with determining whether the district court erred by concluding that Carr was not entitled to have any access to or possession of E.N.C.

Except in certain circumstances, the family code requires that a district court appoint a parent as possessory conservator if it does not appoint the parent as managing conservator. Tex. Fam. Code Ann. § 153.191 (West 2008). In particular, the code provides as follows:

> The court shall appoint as a possessory conservator a parent who is not appointed as sole or joint managing conservator unless it finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child.

*Id.*; *see also In re Walters*, 39 S.W.3d 280, 286 (Tex. App.—Texarkana 2001, no pet.) (explaining that appointment of parent as possessory conservator implies that court determined that allowing parent to have some type of access to child will not endanger physical or emotional welfare of child). As with conservatorship determinations, decisions regarding possession and access are guided by what is in the child's best interests. Tex. Fam. Code Ann. § 153.002. District courts have broad discretion to determine what is in a child's best interests. *Coleman v. Coleman*, 109 S.W.3d 108, 110 (Tex. App.—Austin 2003, no pet.). Likewise, district courts have discretion to determine the terms of conservatorship, *Green v. Green*, 850 S.W.2d 809, 812 (Tex. App.—El Paso 1993, no writ), including the frequency and duration of visitation rights, *Hill v. Hill*, 404 S.W.2d 641, 643 (Tex. Civ. App.—Houston 1966, no writ). In general, there is a presumption that courts should order the standard possession schedule found in the family code,[13] Tex. Fam. Code Ann. § 153.252

---

[13] For children over three, the family code states that there is a rebutable presumption that it is in the best interests of a child to follow the standard possession order outlined in the code. Tex. Fam. Code Ann. § 153.251 (explaining that standard possession order applies to children three years or older), .252 (describing presumption), .311-.317 (West 2008) (establishing standard possession order). For children under three, the family code authorizes a court to issue an order detailing possession of the child but also instructs the court to issue a prospective order to "take effect on the child's third birthday, which presumptively will be the standard possession order." Tex. Fam. Code Ann. § 153.254 (West 2008); *see id.* § 153.256 (West 2008) (detailing factors for court to consider when issuing possession orders that differ from standard possession order).

(West 2008), but if a court determines that issuing a standard possession order would not be in the child's best interests, the court may restrict possession or access in order to eliminate any potential danger to the child or may completely deny possession and access, *In re Walters*, 39 S.W.3d at 286. However, courts may not impose restrictions or limitations on a right to a parent's possession of or access to a child that exceed what is "required to protect the best interests of the child." Tex. Fam. Code Ann. § 153.193 (West 2008). Further, courts should only decide to deny a parent all access and possession in the most extreme of circumstances. *Green*, 850 S.W.2d at 812; *see Allison v. Allison*, 660 S.W.2d 134, 137 (Tex. App.—San Antonio 1983, no writ) (explaining that possession and access will only be completely denied when "there are *extreme grounds* to support such a denial"); *Hill*, 404 S.W.2d at 642 (same). Because the right that exists between a parent and his child is one of "constitutional dimensions" and due to the extreme nature of a determination cutting off all access and possession, courts review complete denials of access under a heightened standard. *Allison*, 660 S.W.2d at 137; *see also In re M.S.R.*, No. 13-05-00493-CV, 2007 Tex. App. LEXIS 8705 (Tex. App.—Corpus Christi Nov. 1, 2007, pet. denied) (mem. op.) (explaining that more exacting standard is used for reviewing orders denying all access and possession and that there is little case law describing when it is appropriate to deny access and possession rather than limit it).

In this case, the district court generally determined that Carr was not entitled to any access or possession. In addition, the district court concluded that Carr was not entitled to any access or possession because she has a history or pattern of committing family violence.

As discussed in the previous section, the evidence introduced at trial supported the district court's determination that Carr should not be a managing conservator for E.N.C. In addition

28

to the evidence previously discussed, other evidence was introduced showing that Carr's ability, as a possessory conservator, to have access to E.N.C. should be limited. For example, David testified that Carr would not respect an order prohibiting her from allowing Garner to be present during her visits with E.N.C. In light of Carr's romantic history with Garner, Ann also could not rule out the possibility that Carr might ignore that type of instruction,[14] and Kerry Daun believed that giving Carr visitation rights would allow Garner to interact with E.N.C. Furthermore, both Renay and Kerry testified that if Carr was given visitation rights, the visitation should be supervised.

In addition, although Carr testified that she wanted the district court to issue an order prohibiting Garner from having any contact with E.N.C. and that she was willing to do whatever was necessary to keep Garner away from E.N.C., after giving her testimony and during her psychological evaluation, Carr stated that she was willing to allow Garner to interact with E.N.C. Further, although she acknowledged that Garner had significant personal problems that needed to be addressed, Carr stated that she would still allow Garner to have "limited involvement in [E.N.C.]'s life" even before he "address[ed] those concerns in an appropriate, constructive fashion."

Even though the evidence presented at trial would support a decision to limit Carr's rights of access and possession, it does not demonstrate the presence of extreme circumstances needed to justify a denial of all access and possession. *Cf. In re J.A.J.*, 243 S.W.3d at 616 (explaining that evidence that would satisfy determination that parent should not be appointed as managing conservator might not support determination that termination of rights was appropriate).

---

[14] Even though Ann testified that Carr had been subject to court orders in the past and had complied with them fully, she also stated that she was not certain that Carr would comply with a requirement prohibiting contact between Garner and E.N.C.

Regarding the family-violence determination, there was a great deal of evidence showing that Carr had been involved in several relationships in which she had been the victim of physical abuse; however, relatively little evidence was introduced indicating that Carr had been the initiator of physical violence.[15]  The only evidence introduced regarding the possibility that Carr may have initiated physical abuse towards Garner was presented during the testimony of David and Kerry Daun and in an affidavit filed by Garner.[16]

For example, Kerry generally testified that he believed Carr was "violent, herself," but he admitted that his assessment arose from conversations he had with Carr regarding the abuse that Garner had inflicted on her and C.C. and regarding Carr's decision to repeatedly reconcile with Garner.  In other words, Kerry's conclusion was not based on personal observations.  In his

---

[15]  Although the context was different, we note that the supreme court cautioned in *Lewelling v. Lewelling* that a "parent should not be denied custody of a child based on the fact that he or she has been battered."  796 S.W.2d 164, 167 (Tex. 1990).  That same logic would seem to compel a determination that a parent should not be denied all access, even supervised visitation, because the parent has been the victim of abuse.  *Cf.* Tex. Fam. Code Ann. § 153.004 (West 2008) (allowing court to consider whether *party seeking conservatorship* has intentionally used "abusive physical force" when making conservatorship determinations but limiting consideration to violence "against the party's spouse, a parent of the child, or any person younger than 18 years of age").

[16]  In her testimony, Ann testified regarding three acts of aggressive behavior by Carr, none of which were directed at C.C. or Garner.  *Cf.* Tex. Fam. Code Ann. § 153.004.  Two of the events occurred many years before this suit was filed.  *See id.* (stating that court may consider evidence of abusive physical force occurring within *two* years of filing of suit).  The first occurred ten years before Ann testified.  Regarding that incident, Ann stated that Carr had shoved her once at the end of an argument between them.  The second incident also occurred approximately ten years before the trial in this case and involved one of Carr's former husbands.  Although Ann did not specify who initiated the violence, she testified that Carr and her previous husband "had been violent with one another."  Finally, Ann testified regarding another incident that occurred between her and Carr.  The timing of the incident is not entirely clear from the record but seems to have been approximately one year before Ann gave her testimony.  Although she did not specify what happened, Ann testified that after she intervened in an argument between Carr and C.C., Carr acted "physically aggressive towards [Ann]."

testimony, David generally stated that he had observed instances in which Carr had initiated physical aggression against Garner, but he only testified regarding one incident. Specifically, he stated that several years before the trial, he observed Carr escalate an argument that she was having with Garner by yelling obscenities and by throwing things.

Garner's affidavit was filed in the Montgomery County proceeding in which he asked the court to issue a temporary restraining order preventing Carr from finalizing E.N.C.'s adoption. In the affidavit, Garner stated that Carr "would become violent on a fairly regular basis" and had "physically assaulted" him. No final resolution was reached in that case, and Garner discontinued his participation in the present case. Accordingly, he provided no testimony relating to the allegations he made in the affidavit.

Although this evidence is some indication that Carr may have initiated physical violence against Garner, the other evidence presented during the trial, which was detailed in the preceding section, demonstrated that Carr had been a victim, rather than a perpetrator, of family violence. Carr, Ann, Lisa Daun, and Vanderwel each testified regarding physical abuse that Garner had inflicted on Carr and injuries Carr had sustained as a result of the abuse. Further, even though Carr and Ann both admitted that Carr would physically defend herself when attacked by Garner, each of them testified that Carr did not initiate any abusive behavior.[17] In addition, Lisa stated that she had never seen Carr be physically aggressive with anyone. Similarly, the case worker performing a home study on Carr's house, Debi Felder, testified that while performing her investigation, she did

---

[17] In her testimony, Carr stated that she had not been violent with any of the men she had ever been involved with.

31

not find any history of violent or abusive behavior by Carr but had discovered that Carr had been the victim of abuse.

More importantly, none of the evidence presented during trial suggested that Carr had physically abused C.C. or would abuse E.N.C. if Carr was given some form of access to E.N.C. Although Lisa and Kerry Daun each testified that they had heard Carr scream at C.C., the remainder of the evidence introduced at trial concerning Carr's interactions with C.C. and her relationship with C.C. showed that Carr cared for C.C. and tried to be a good mother to C.C. For example, Carr testified that she helped C.C. with her schoolwork and extracurricular activities and that C.C. was a good student. Further, Carr stated that she makes it a priority to ensure that C.C. fulfills all of her responsibilities. Moreover, Ann testified that Carr was a good mother to C.C., that C.C. was healthy and well nourished, and that Carr had a steady job, was working hard at her job, and was responsibly using the money she earned to support herself and C.C.[18] Noack also testified that Carr was a good mother to C.C. and that she had never seen Carr behave inappropriately towards C.C.

In addition, Felder testified that although child protective services had prepared one report concerning Carr's parenting of C.C., the case was not pursued, and Felder further stated that she found no evidence that C.C. had ever been abused by Carr. To the contrary, Felder stated that Carr is a good mother to C.C., that Carr and C.C. were very close, that Carr disciplines C.C. appropriately, and that Carr made school a priority for C.C.

---

[18] As mentioned previously, Ann did testify that on one occasion, she intervened in an argument between Carr and C.C., but Ann did not testify that Carr had displayed any type of abusive behavior towards C.C. during that incident.

Regarding Carr's possible interaction and access to E.N.C., Felder testified that after investigating Carr's situation and home, she had discovered nothing that would give her pause about allowing E.N.C. to go to Carr's home or that caused her to have concerns about whether Carr would be a good parent to E.N.C.[19] To the contrary, Felder testified that Carr was in good health and had no history of mental illness. Further, Felder stated that Carr's home was safe, stable, and clean. In her testimony, Lisa Daun stated that, to her knowledge, Carr was working full-time, took care of her daughter C.C., had lived in the same house for some time, and had the support of her parents. Lisa also testified that Carr's home was safe provided that Garner was not present. Similarly, Ann stated that Carr's home was safe and also testified that Carr would be a good mother to E.N.C. and that Carr would do her very best to perform all the tasks that good parents must when fulfilling their parental responsibilities. In her testimony, Ann stated that it was in E.N.C.'s best interests to have some type of access to and visitation with Carr.

During her testimony, Carr also expressed her belief that she should be allowed to be a part of E.N.C.'s life and that her presence in E.N.C.'s life would be beneficial to E.N.C. Specifically, she testified regarding her extended-family support network and stated that her parents were a big part of C.C.'s life and would be there to help with E.N.C. as well. Additionally, although Carr admitted that she occasionally had to borrow money from her parents and others in the past, she stated that she has been consistently employed for several years and is now financially secure.

---

[19] It is worth noting that Felder testified that after performing her investigation, she had no reason to believe that Carr would ignore a court order prohibiting Garner from having contact with E.N.C.

Finally, Carr testified that she was ready to care for E.N.C. and that she had already prepared a place in her home.

During the trial, evidence was also presented indicating that some form of visitation schedule could be crafted that would allow Carr to have some interaction with E.N.C. but also satisfy any potential safety concerns. For example, evidence was presented demonstrating that prior to this suit being filed, Carr had been allowed to have supervised visits with E.N.C., that Carr complied with the requirements established by the Dauns regarding the visits, and that she ended the visits without incident. Further, Lisa Daun testified that Carr had never attempted to take E.N.C. from Lisa or her husband's custody. Finally, although Lisa expressed concern about allowing unsupervised visitation, she admitted that she would not have a problem with allowing E.N.C. to visit with Carr and Carr's family provided that the visits occurred at the Dauns' home.

In light of the higher standard that we must employ in reviewing a complete denial of access; in light of the little evidence showing that Carr had been a perpetrator, rather than a victim of family violence; and in light of the evidence describing Carr's treatment of C.C. as appropriate and non-abusive, indicating that Carr would properly parent E.N.C., and demonstrating that a less restrictive determination regarding access and possession, such as supervised visitation, could be ordered and still address any potential safety concerns, we must conclude that the district court erred by determining that the circumstances present in this case warranted the extreme action of denying Carr all access and possession. Accordingly, we reverse the district court's order to the extent that it denied Carr all access and remand the case back to the district court so that the court may determine what amount and type of access are appropriate under these circumstances.

**Findings of Fact and Conclusions of Law**

As mentioned previously, after Carr filed her appeal, this Court remanded the case back to the district court so that the district court could issue findings of fact and conclusions of law supporting its determination. After the district court issued its findings and conclusions, the parties filed supplemental appellate briefs. In her supplemental briefing, Carr challenges most of the findings and conclusions by asserting that the findings and conclusions are not supported by the evidence and are erroneous. Those challenges are cumulatively referred to as Carr's seventh issue in her supplemental briefs.

The district court issued fifteen findings and twenty-three conclusions; however, not all of the findings and conclusions bear upon the resolution of this appeal. For example, the district court issued several findings and conclusions regarding Garner and regarding obligations imposed upon him; however, Garner discontinued his participation in the trial in this case and is not a party to this appeal. Accordingly, we need not address those findings or conclusions here. Moreover, many of our determinations in this appeal have negated the need to address some of the findings and conclusions. For example, given our prior conclusion that parental consent is not required to confer standing under section 102.003(a)(9), we need not address the findings and conclusions relating to whether Carr or Garner had consented to the Dauns' possession of E.N.C. Similarly, because we have reversed the portion of the district court's judgment denying Carr all access and possession, we need not address those findings and conclusions stating that Garner should not have any access to or possession of E.N.C. Finally, as discussed earlier, the family code allows courts to decide that it would not be in a child's best interests to appoint one of his parents as a managing conservator

35

when at least one of two alternative grounds are satisfied: if "the appointment would significantly impair the child's physical health or emotional development" or if there is a history of family violence. *See* Tex. Fam. Code Ann. § 153.131. Having determined that the district court did not abuse its discretion by concluding that the appointment of Carr would significantly impair E.N.C.'s physical health or emotional development, we also need not address the district court's findings and conclusions stating that Carr had been the perpetrator of family violence. In light of the preceding, we now address those findings and conclusions that bear upon and are necessary to the resolution of this appeal. *See* Tex. R. App. P. 47.1 (explaining that courts must hand down opinions that are as brief as possible and that address those issues necessary to final disposition of the appeal).

In its findings and conclusions, the district court made the following determinations:

- The family code does not require either of a child's parents to consent to the possession of the child by a nonparent in order for the nonparent to file a suit affecting the child's parental relationships

- The Dauns had standing to file this suit, and the district court had jurisdiction over the suit

- Carr disclosed the violent nature of her relationship with Garner to Living Legacy employees

- Carr failed to protect C.C. from family violence

- Carr had been romantically involved with several abusive partners, including Garner

- Carr remained in abusive relationships after being abused

- Carr kept Garner informed regarding the trial and was involved with Garner at the time of the trial

- Garner paid Carr's legal expenses

36

- C.C. had been the victim of family violence and on at least two occasions observed physical violence between Carr and a man Carr was romantically involved with

- It would not be in E.N.C.'s best interests to appoint Carr as managing conservator of E.N.C.

- It was in E.N.C.'s best interests to name Car as possessory conservator but to limit Carr's rights and duties

- The Dauns provided E.N.C. with a safe and stable home life

- It was in E.N.C.'s best interests to remain in the custody of the Dauns and for the Dauns to be appointed as managing conservators of E.N.C.

These determinations are supported by the relevant family code provisions and by the evidence presented during trial and detailed earlier in the opinion. In addition to challenging these findings and conclusions, Carr also objects to the district court's determination that she should pay "$150 per month based upon the minimum wage presumption of net resources with credit for one child not before the court." Carr contends that the minimum-wage presumption does not apply because evidence was introduced regarding her salary. *See* Tex. Fam. Code Ann. § 154.068 (West 2008) (explaining that court may presume that party makes minimum wage and works full time when no "evidence of the wage and salary income of a party" is presented). Alternatively, Carr asserts that the amount of child support imposed by the district court was too high and was not properly based on the monthly income for a minimum wage earner in 2006.

Assuming without deciding that the evidence is insufficient to support the award based on the minimum-wage presumption, we would still uphold the child-support award. As mentioned by Carr, the same child-support obligation is found in the district court's order, and the

district court originally imposed the obligation when it rendered judgment. Further, when rendering its judgment, the court stated that the $150 amount is "significantly below guidelines, and the reduction is based upon financial hardship."

When reviewing child-support amounts, appellate courts will not disturb a district court's determination absent an abuse of discretion. *Goodson v. Castellanos*, 214 S.W.3d 741, 757 (Tex. App.—Austin 2007, pet. denied). During the trial, Carr testified that she made approximately $1800 per month, worked 40 hours a week, and had been consistently employed for years. Based on her income, the district court could have imposed a child-support payment that was greater than $150 per month. *See* Tex. Fam. Code Ann. §§ 154.125 (establishing child-support obligations based on obligor's monthly net resources), .128 (providing one means of establishing child-support obligations when obligor has children in more than one household), .129 (West 2008) (explaining alternative method for computing child support when obligor has child in more than one household).

However, the family code provides that a court may decide to impose a child-support award that differs from the guidelines established by the family code when "the application of the guidelines would be unjust or inappropriate under the circumstances." *See id.* § 154.122 (West 2008). Further, the family code provides a list of nonexclusive factors that courts may consider when deciding whether to impose a child-support obligation that differs from the amount calculated under the family code guidelines, including the ability of the parent to contribute to the child, any financial resources that are available for the support of the child, the amount of time that the parent has access to or possession of the child, and debts that the parent has assumed. *Id.* § 154.123 (West 2008).

During the trial, evidence was presented demonstrating that although Carr was consistently employed, she did not always have enough money to cover her expenses and that she had to borrow money from others on more than one occasion. Further, during trial, it was revealed that Carr has not had possession of E.N.C. since she initially placed E.N.C. with the Dauns. Finally, evidence was also introduced regarding the Dauns' employment and financial stability, and the Dauns stated that they were not expecting Carr to pay child support. In light of this evidence, the unusual nature of this case, and the fact that the district court also ordered Garner to pay child support, we cannot conclude that the district court abused its discretion by determining that using the typical child-support guidelines to determine Carr's child-support obligation would have been inappropriate in this case or by requiring Carr to pay the amount of child support that it ordered.[20]

In light of the preceding, to the extent that Carr's seventh issue challenges the sufficiency of the district court's findings and conclusions that bear upon the portion of the district

---

[20] In her seventh issue, Carr also disputes the district court's determination that "it had the ability to enjoin . . . Carr from having . . . Garner . . . with her for the visitation times and dates set forth in the final order." Specifically, Carr argues that the district court did not have the authority to issue that injunction because that type of injunction was not mentioned in the pleadings before the court. Because the visitation times mentioned expired before the district court issued its order in this case, we need not address whether the district court had the authority to enjoin Carr from having Garner present during those specific visits. However, we do note that in her testimony, Carr explicitly asked the court to issue an order prohibiting Garner from having contact with E.N.C. Further, we note that the best interest of the child is the paramount consideration to be employed in all issues relating to "possession of and access to" a child, see Tex. Fam. Code Ann. § 153.002 (West 2008), and that courts are given broad discretion to determine what is in a child's best interests, In re Herd, 537 S.W.2d 950, 952 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e.), including the ability to craft orders that are dictated by the facts presented during trial, see White v. Adcock, 666 S.W.2d 222, 225 (Tex. App.—Houston [14th Dist.] 1984, no writ). This discretion would seem to include enjoining one party from allowing a specific individual to be present during visitation periods provided that the facts presented supported that determination.

court's judgment affirmed in this case and that must be addressed to properly resolve the issues on appeal, we overrule Carr's seventh issue on appeal.

## CONCLUSION

For all the reasons previously given, we conclude that the Dauns had standing to file this suit and affirm the portion of the district court's judgment naming the Dauns as managing conservators, and we also conclude that the various findings and conclusions previously discussed are supported by the evidence presented during trial and by the relevant family code provisions. However, we reverse the portion of the judgment denying Carr all access and possession to E.N.C. Accordingly, we remand this case back to the district court for a determination regarding what amount and type of access Carr should be awarded.

David Puryear, Justice

Before Justices Patterson, Puryear and Henson
  Concurring/Dissenting Opinion by Justice Patterson

Affirmed in part; Reversed and Remanded in part

Filed: March 13, 2009